Lewis NERMAN, Jerome Nerman, Larry Spitcaufsky, Arrow Truck Sales, Inc., Emmett R. Davis, Robert and Jean Gentle, Allan E. Hall, Mrs. Louis Kaplan, Barney Karbank, Gerald Rabin, Mrs. Melvin Spitcaufsky, Cleo L. Shaw, Richard Lee Shaw, Marty Dubowy and Mark Dubowy, individually and d/b/a M & M Investments, Sam Price and Steve Price, individually and d/b/a Sam and Steve Price Joint Venture, and Lewis Nerman, Jerome Nerman, Larry Spitcaufsky, and Mrs. Melvin Spitcaufsky, as shareholders for Arrow Fleet Sales, Inc., Appellants,

v.

ALEXANDER GRANT & COMPANY, now known as Grant Thornton, Joseph J. Haith, John C. Burke, individually and as representative of the defendant class of Grant Thornton Partners, Appellees.

Michael L. ALBERT, Gerald R. Livingston, Nels D. Eliason, Bernard Magid, Robert Holmes, James Nesci, Myron "Mike" Milder, Jerome Milder, Appellees,

v.

GRANT THORNTON (formerly Alexander Grant), a general partnership, John C. Burke, Joseph J. Haith, Appellants.

Nos. 90–1893, 90–1931.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 10, 1990.

Decided Feb. 21, 1991.

James P. Keller, St. Louis, Mo., for appellants.

Alan S. Rutkoff, Chicago, Ill., for appellees.

Before BEAM, BRIGHT, Senior Circuit Judge, and WOODS,* District Judge.

HENRY WOODS, District Judge.

## I. INTRODUCTION

The district court[1] granted the defendants' motion for summary judgment on the plaintiffs' state claims for fraud and negligence in two virtually identical cases, consolidated for trial.[2] The plaintiffs in

---

* The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. The Hon. D. Brook Bartlett, United States District Judge for the Western District of Missouri.

2. Federal claims, including allegations of violations of the SEC Act of 1934 and RICO, had been previously dismissed and are not subject to this appeal.

*Lewis Nerman, et al. v. Alexander Grant & Company, et al.* have appealed the district court's order that their suit was not filed within the applicable five year statute of limitations.[3] The defendants, Alexander Grant & Company n/k/a Grant Thornton ("Grant") and individual Grant partners, have appealed the district court's order in *Michael Albert, et al. v. Grant Thornton,* because the district court declined to impose Rule 11 sanctions.

We affirm both the district court's order granting the defendants' motion for summary judgment against the *Nerman* plaintiffs 735 F.Supp. 1443 and the district court's order denying the defendants' motion for sanctions against the *Albert* plaintiffs.

## II.  BACKGROUND

It is undisputed that in December 1976, the plaintiffs invested as limited partners in a Kentucky coal mining venture, known as "Polls Creek." In their amended complaint, the plaintiffs alleged that Grant, a national accounting firm, fraudulently induced them to invest in Polls Creek by making material and false representations.

The plaintiffs specifically alleged that Grant represented to them in November and December of 1976: (1) that the Polls Creek venture would be a wise investment, (2) that the investment would provide a profit of at least 20% within a reasonable period of time, (3) that it would present no risk of loss, (4) that it would enable them to take a substantial tax write-off worth several times their investments, and (5) that there was *no risk that the tax shelter deductions would be disallowed by the Internal Revenue Service.* App. at 53.

The plaintiffs took the Polls Creek tax deductions on their 1976 tax returns, filed in April of 1977. As it turned out, not only was the Polls Creek investment virtually worthless, but the Internal Revenue Service disallowed the tax write-offs and assessed the plaintiffs interest and penalties on the unpaid taxes.

It is undisputed that the plaintiffs received a one-hundred page memorandum in February, 1977, two months after the investment was made, setting out numerous risks of the Polls Creek investment, including "substantial tax risks." This memorandum, in effect, disclaimed most, if not all, of the alleged misrepresentations made by Grant in December, 1976.

For example, the memorandum warned the plaintiffs that the Polls Creek investment involved a "high degree of risk," and that it was "suitable only for those persons who have, and will continue to have, a high amount of annual income and a substantial net worth and who can afford to bear such risks and have no need for liquidity from such investment." App. at 536. The memorandum further warned that there was "no assurance that such coal reserves in fact exist, are in such quantities, consistently, or on the average or have the specifications shown in the report or that such reserves are physically or economically recoverable." App. at 536.

The Polls Creek investors were told in the February memorandum of "the risk that, because of its inability to pay its fixed obligations on the Note to Sublessor, [the limited partnership] may have to forfeit the Coal Rights. In such event the Limited Partners may lose their entire investment and also realize a substantial tax burden." App. at 536–37. The plaintiffs were warned that there was:

no assurance that the Partnership will be able to market its coal at a price which will permit it to recover costs incurred under the Contract Mining Agreement and still earn a profit. In the event that it is unable to cover such costs, the Partnership and the Limited Partners may suffer substantial adverse financial consequences, including the loss of their entire investment.

App. at 537.

Additionally, the plaintiffs were told in the memorandum that each of them should *assume,* "that the Internal Revenue Service would claim that some if not all of the deductions this Partnership will claim are

---

3.  Mo.Rev.Stat. § 516.120.

not allowable; this means *every partner* of this Partnership should *assume* he will be audited." App. at 545 (emphasis original).

One part of the memorandum dealt specifically with the tax ramifications: "There is a substantial risk that upon challenge, the deductions, particularly with respect to the portion to be paid by issuance by the Nonrecourse Note, could not be sustained by litigation." App. at 559.

In spite of this comprehensive warning, which effectively disclaimed all of the representations allegedly made to induce the plaintiffs to invest, the plaintiffs contend that their damages did not accrue until 1981 when the IRS notified them that their tax deductions would be disallowed. According to the plaintiffs' theory, their cause of action did not accrue until the last element of their damages could be ascertained, that is, when the tax deductions were actually disallowed.

The parties argue that the resolution of this case lies in the interpretation of Section 516.100 Mo.Rev.Stat. (1986), which states in pertinent part:

> [T]he cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

Under the plaintiffs' theory, the last item of damage, that is, the disallowance of the deductions taken on their 1976 tax returns, did not occur until 1981, well within five years of filing suit in 1984.[4] According to the plaintiffs, had they sued prior to the disallowance, they could not have recovered for this element of damage. They argue that a claim for the loss of the tax deduction filed prior to 1981 would have been deemed too speculative.

**4.** There is disagreement about when suit was filed for purposes of calculating the five-year limit because the plaintiffs took a voluntary nonsuit after filing the suit in April 1977. We need not reach this issue because the memoran-

## III. DISCUSSION

### A. *The Statute of Limitations*

Both plaintiffs and defendants contend that the issue for this Court to determine is whether, under Missouri law, a cause of action accrues, and thus the limitation period begins to run, at the time of ascertainment of *some* damage or at the time the *last* item of damage can be ascertained. Plaintiffs do not argue that the statute requires waiting until the exact *amount* of the last item of damage can be ascertained, but they do contend that the limitations period begins to run only when the *fact* that damage will be sustained can be ascertained. Thus, plaintiffs argue, until the IRS actually disallowed the 1976 deductions, sometime in 1981, they could not ascertain that they would suffer that element of damage. Both plaintiffs and defendants cite Missouri cases interpreting Section 516.100, quoted above, in support of their positions.

■ The resolution of this case, however, lies not in determining whether the limitations period commences when the first or the last element of damage is ascertained, but rather in determining what damages are available in Missouri for fraud and misrepresentation. On this point, the Missouri case law is clear and unambiguous. In a recent case the Missouri Supreme Court, sitting *en banc*, held:

> The courts of this state are committed to the benefit of the bargain rule as a method of arriving at damages in a case of fraud and deceit. It allows a defrauded party to be awarded the difference between the actual value of the property and what its value would have been if it had been as represented. *Smith v. Tracy*, 372 S.W.2d 925, 938 (Mo.1963), *as quoted in Auffenberg v. Hafley*, 457 S.W.2d 929, 937 (Mo.App.1970). *The damages are measured at the time of the transaction. Id.* at 937.

dum sent to the plaintiffs in February, 1977 pre-dates by more than five years the filing of the complaint whether it is deemed filed April 24, 1984 or September, 24, 1984.

*Heberer v. Shell Oil Co.*, 744 S.W.2d 441 (Mo.banc 1988) (emphasis added). Furthermore, the Missouri Court of Appeals has recently held:

> An action for relief on the ground of fraud, however, accrues—not when the resulting damage is capable of ascertainment—but when the facts constituting the fraud are discovered. *It is governed not by the limitations provisions of § 516.100, but by the limitations provisions of § 516.120(5)....*

*Schwartz v. Lawson*, 797 S.W.2d 828 (Mo. App.1990) (emphasis supplied).

All of the plaintiffs' damages can and must be measured as of the time of the transaction. That is to say, all of their damages are composed of the value of their interests in the Partnership *as it was represented* as compared to the value of their interests in the Partnership *as it actually was at the time of purchase.*

Stated another way, the plaintiffs' entire remedy is the difference between the value of a Partnership in a coal mining venture with *no* risk of loss, with a 20% return, with a four-to-one tax write-off, with *no* risk of disallowance by the IRS[5] *minus* the actual value of a Partnership with high risk of loss of the entire investment, substantial risk of tax liability, and virtually no return on the investment.

■ As a general rule, the statute of limitations for fraud begins to run "at the time the defrauded party discovered or in the exercise of due diligence, should have discovered the fraud." *Burr v. National Life & Accident Insurance Co.*, 667 S.W.2d 5, 7 (Mo.App.1984). However, because defendant Grant was in a fiduciary relationship with the plaintiffs in this case, the cause of action accrued and limitations period began to run only upon the plaintiffs' actual discovery of the fraud. *Id.* The relevant question, then, is: When did the plaintiffs know that the Polls Creek investment was not what it was represented to be?

■ The February 1977 Memorandum, received by all the plaintiffs, unequivocally disabused any notion that the Polls Creek investment was risk-free or a "sure thing." The plaintiffs knew, or should have known, after receiving the February Memorandum, that the Partnership in which they had invested was far from what Grant allegedly represented to the plaintiffs in December of 1976. Perhaps the plaintiffs did not care that some of the representations were false (i.e. the amount of return on the investment), so long as the tax deduction was intact. Their lack of concern over the falsity of *some* of the representations cannot alter the fact that they knew in February of 1977 that the representations allegedly made in December 1976 were false. They knew *then* that the tax deduction was far from safe, contrary to the alleged representation that there was no risk of a disallowance.

■ The plaintiffs argue that they had no incentive to sue until the disallowance by the IRS. This contention misses the point. Whether a given plaintiff has an *incentive* to sue is quite different from whether he or she has a cause of action. Wronged persons often decline to sue because there is insufficient incentive. In sum, incentive to sue has nothing whatsoever to do with when a cause of action accrues.

■ Perhaps it was reasonable for the plaintiffs to take a "wait and see" approach. But that election did not toll the statute of limitations. That is precisely the point of the statute of limitations: the plaintiffs had five years to "wait and see," and to decide whether to sue for fraud or live with the less-than-promised deal.

B. *Estoppel*

■ The plaintiffs argue that because Grant was in a fiduciary relationship with them, and because Grant continued to advise them to "wait and see," Grant should be estopped from asserting a statute of limitations defense. Certainly the statute

---

**5.** The value of the Partnership *as represented* is, presumably, the amount the plaintiffs, as will-

ing purchasers, actually paid for it.

should be tolled if the perpetrator of a fraud prevents discovery.

However, the plaintiffs do not contend that Grant advised them to wait and see whether the investment turned out to be all they had bargained for. All parties knew and discussed the myriad problems with the Polls Creek investment, running from the lack of promised returns on the investment to possible loss of the entire investment.

The plaintiffs argue that Grant encouraged them to wait and see whether they would win or lose the tax deduction issue. The fact remains that the plaintiffs alleged in their amended complaint that they paid for a *risk free* tax deduction. What they got was a chancy tax deduction.

Even if Grant continued to reassure the plaintiffs regarding the tax deductions, as alleged, that does not alter the fact that the plaintiffs knew within two months of making the investment that the value of the limited partnership was not what it was represented to be—risk free. They paid for a sure thing; they got a risky investment. The fact that the risk turned out badly is irrelevant.

### C. *Sanctions*

██ We will not reverse a district court's Rule 11 determination absent an abuse of discretion. *Cooter & Gell v. Hartmarx Corp.,* —— U.S. ——, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). In order to find an abuse of discretion we must find either that the district court based its decision on "an erroneous view of the law or a clearly erroneous assessment of the evidence." *NAACP Special Contribution Fund v. Atkins,* 908 F.2d 336, 339 (8th Cir.1990) (quoting *Cooter,* 110 S.Ct. at 2461). A thorough review of the record in this case reveals neither.

### IV. CONCLUSION

The district court correctly applied the pertinent Missouri statute of limitations. There was no abuse of discretion in its refusal to sanction the *Albert* plaintiffs.

Accordingly, the orders of the district court are hereby affirmed.