Larry D. JOHNSTON; Lawrence G. Lyon; and H. Rodgers Company, a Colorado general partnership, Plaintiffs–Appellants,

v.

CIGNA CORPORATION; CIGNA Individual Financial Services Company; CIGNA Securities, Inc.; CIGNA Financial Partners, Inc.; CIGNA Holdings, Inc.; and M. Doak Jacoway, Defendants–Appellees.

No. 93CA1664.

Colorado Court of Appeals,
Div. I.

March 7, 1996.

Rehearing Denied Aug. 1, 1996.

Pendleton, Friedberg, Wilson, Hennessey & Meyer, P.C., Alan C. Friedberg, Robbin A. Lego, Denver, for Plaintiffs–Appellants.

Gibson, Dunn & Crutcher, David G. Palmer, Thomas M. Piccone, Mary Scherschel Brady, Denver, for Defendants–Appellees.

Opinion by Judge METZGER.

Plaintiffs, Larry D. Johnston, Lawrence G. Lyon, and H. Rodgers Company, appeal the partial summary judgment entered in favor of defendants, CIGNA Corporation, CIGNA Individual Financial Services Company, CIGNA Securities, Inc., CIGNA Financial Partners, Inc., CIGNA Holdings, Inc., and M. Doak Jacoway. The trial court concluded that plaintiffs' claims of common law breach of fiduciary duty and negligence were time-barred by the statute of limitations. We reverse and remand with directions.

Plaintiffs Johnston and Lyon are owners of a computer systems marketing company. They are college graduates with business degrees in marketing and have other investments in real estate and partnerships. Plaintiff H. Rodgers Company is a partnership created by Johnston and Lyon through which they made investments, including those at issue here.

Since the late 1970s, defendant Jacoway, an employee and agent of CIGNA, provided plaintiffs with insurance consultation, insurance policies, advice for profit sharing and pension plans, estate planning, and preparation of wills and trusts. In addition, he developed financial plans for plaintiffs. Plaintiffs' financial objectives as stated in the plans included expectations of a relatively conservative eight percent rate of return on their investments. The plans also provided that only one percent of plaintiffs' assets should be allocated to "risky investments."

During the 1980s, at Jacoway's suggestion, plaintiffs invested in four separate real estate limited partnerships, for approximately $850,000. Two of the investments were purchased in 1983 and the other two in 1987. Jacoway told plaintiffs that the investments were "good," had long-term economic benefits, and were suitable for their investment objectives.

Before investing in the partnerships, Jacoway gave plaintiffs Private Placement Memoranda (PPM) and Subscription Agreements describing each investment. The documents warned that the offerings involved "a high degree of risk" and were "suitable only for persons of substantial financial means who have no need for liquidity in their investments."

However, according to plaintiffs, Jacoway told them that the PPMs and Subscription Agreements consisted predominately of disclaimers that "had to be put in there" to "satisfy the regulations" and that he would tell them orally everything they needed to know.

Plaintiffs also assert that Jacoway told them that the investments had CIGNA's "Good Housekeeping seal of approval" and that CIGNA, the general partner in the partnerships, was a $30 billion company that had a reputation to protect. Therefore, he said,

CIGNA would take an active role in monitoring the partnerships and that it would "stand behind" the investments and rectify any problems that might arise with them because it did not want to allow investments taken to individual clients to "give CIGNA a black eye."

After the sales and well into 1989, plaintiffs recalled, Jacoway and CIGNA executives told them and/or their accountant that CIGNA would "stand behind" the investments and would solve any problems with them. However, all the investments resulted in significant losses. In August 1989, the plaintiffs were told by the president of CIGNA Securities, Inc., that CIGNA would not indemnify them for losses incurred in the investments.

Plaintiffs assert that they lost approximately $1 million on the four investments and, as a result, they initiated this action.

Plaintiffs alleged that defendants had "held themselves out as financial planners and investment advisers ... encouraged and built a relationship of trust and confidence between themselves and plaintiffs which resulted in plaintiffs' purchase of the limited partnership interests ... owed plaintiffs the fiduciary duty to exercise a reasonable degree of skill and to conform to the legal and ethical standards which govern investment advisers and financial fiduciaries," and breached those duties. Plaintiffs also alleged that defendants had "failed to employ that degree of care, skill, knowledge and judgment on behalf of plaintiffs ordinarily possessed by members of the financial planning and investment advisor professions and were negligent in recommending the purchases of the limited partnership interests to plaintiffs."

Defendants' answer to the breach of fiduciary duty claim admitted that defendants had provided planning services to plaintiffs; however, it went on to state that plaintiffs "were expressly informed, understood and acknowledged that Jacoway and CIGNA Securities, Inc., were acting in the capacity of broker-dealer, and not in the capacity of investment advisor, in offering limited partnership investments to plaintiffs."

Because the action had been filed initially in federal court, upon its refiling in the state district court, that court determined the filing date to be January 1990, pursuant to the repose statute, § 13–80–111, C.R.S. (1987 Repl.Vol. 6A). Defendants moved for summary judgment arguing that, because plaintiffs should be "charged with constructive knowledge of the risk disclosures in the offering materials" given to them when they made the investments, plaintiffs' causes of action were barred by the applicable statutes of limitations.

To the extent pertinent here, the trial court granted the motion and entered summary judgment in favor of defendants and dismissed with prejudice plaintiffs' claims for breach of fiduciary duty as to the 1983 investments and the negligence claims as to both the 1983 and 1987 investments. That partial summary judgment is the basis of this appeal.

## I.

■ Summary judgment is proper under C.R.C.P. 56(c) when the pleadings, affidavits, depositions, or admissions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The moving party bears the burden of establishing that no genuine issue of fact exists. *Continental Air Lines v. Keenan,* 731 P.2d 708 (Colo.1987).

■ In assessing the sufficiency of the evidence for purposes of determining a motion for summary judgment, all inferences from factual averments must be made in favor of the non-moving party. *CenCor, Inc. v. Tolman,* 868 P.2d 396 (Colo.1994).

When ruling on a motion for summary judgment:

[i]t is often the case that although the basic facts are not in dispute, the parties in good faith may nevertheless disagree about the inferences to be drawn from these facts, what the intention of the parties was as shown by the facts, or whether an estoppel or a waiver of certain rights admitted to exist should be drawn from such facts.

*Colorado Springs v. Mountain View Electric Ass'n,* —— P.2d ——, —— (Colo.App. No.

94CA0914, December 21, 1995). Under such circumstances, the case is not one to be decided by the trial court on a motion for summary judgment. *Colorado Springs v. Mountain View Electric Ass'n, supra; see also* 10A C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure* § 2730.1 at 276 (1983).

With respect to plaintiffs' first claim for relief alleging breach of fiduciary duty as to the 1983 investments, the applicable limitation provision is § 13–80–114, C.R.S. (repealed and reenacted by Colo. Sess. Laws 1986, ch. 114, § 13–80–101(1)(f) at 695, now codified at § 13–80–101(1)(f), C.R.S. (1986 Repl.Vol. 6A)). At all times relevant to this dispute, that statute required that an action for breach of fiduciary duty must be commenced no later than five years after the cause of action accrued. *See Van Schaack v. Van Schaack Holdings, Ltd.,* 856 P.2d 15 (Colo.App.1992).

Plaintiffs' negligence claim as to the 1983 investments is governed by § 13–80–110, C.R.S., which provided for a six-year limitations period. *Cf.* § 13–80–102(1)(a), C.R.S. (1995 Cum.Supp.)(now two-year statute of limitations on negligence claims).

For plaintiffs' negligence claims as to the 1987 investments, the limitation period is two years from the date of accrual, pursuant to § 13–80–102(1)(a), C.R.S. (1987 Repl.Vol. 6A). The accrual date is defined under § 13–80–108(1), C.R.S. (1986 Repl.Vol. 6A) as "the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence."

## A.

■ Plaintiffs allege that, because genuine issues of material fact remain concerning whether Jacoway had a fiduciary duty to them, the trial court erred in entering summary judgment. We agree.

■ A fiduciary relationship exists when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of their relationship. A fiduciary relationship can arise when one party occupies a superior position relative to another. It may be based upon a professional, business, or personal relationship. *Moses v. Diocese of Colorado,* 863 P.2d 310 (Colo.1993).

■ In determining when investors in the position of plaintiffs reasonably could have discovered the facts giving rise to these claims, it must be kept in mind that a fiduciary relationship creates a climate of trust in which "facts which would ordinarily require investigation may not excite suspicion, and the same degree of diligence is not required." *Lucas v. Abbott,* 198 Colo. 477, 481, 601 P.2d 1376, 1379 (1979). Thus, it has been observed that confidential relationships may impel or induce a person "to relax the care and vigilance [he or she] would and should have ordinarily exercised in dealing with a stranger." *Ralston Oil & Gas Co. v. July Corp.,* 719 P.2d 334, 338 (Colo.App.1985).

■ Consequently, justified reliance on representations made within the ambit of a fiduciary relationship lessens the duty of reasonable inquiry imposed on an investor who has entrusted a broker with practical investment control. *See Lucas v. Abbott, supra.*

Plaintiffs alleged that defendants, acting as investment advisers and financial planners, created a relationship of trust and confidence and, accordingly, defendants owed plaintiffs a fiduciary duty. These labels are terms of art defined in the federal securities laws.

■ Congress enacted the Investment Advisers Act of 1940, ch. 686, 54 Stat. 847 (1940)(current version at 15 U.S.C. § 80b–1 to 80b–21 (1994)) both to protect the public "from the frauds and misrepresentations of unscrupulous tipsters and touts" and to safeguard bona fide investment counsel from the "stigma of the activities of these individuals." S.Rep. No. 1775, 76th Cong., 3d Sess. 21–22 (1940), as quoted in 7 L. Loss & J. Seligman, *Securities Regulation* 3329 (1991).

■ That Act provides:

'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation

and as part of a regular business, issues or promulgates analyses or reports concerning securities. . . .

§ 202(a)(11), 15 U.S.C. § 80b–2(a)(11). This definition is sufficiently broad to "cover every person who for compensation gives advice with respect to securities, from the highest grade investment counselor who renders personalized service to the publisher of the lowliest tipster sheet." 7 L. Loss & J. Seligman, *Securities Regulation* at 3345. In general, an investment advisor owes a fiduciary duty to his or her customers. *See Paine, Webber, Jackson & Curtis v. Adams,* 718 P.2d 508 (Colo.1986).

Another type of financial consultant is a financial planner. In a 1987 interpretive release, the staff of the Securities & Exchange Commission noted:

> Financial planning typically involves providing a variety of services, principally advisory in nature, to individuals or families regarding the management of their financial resources based upon an analysis of individual client needs. Generally, financial planning services involve preparing a financial program for a client based on the client's financial circumstances and objectives. This information normally would cover present and anticipated assets and liabilities, including insurance, savings, investments, and anticipated retirement or other employee benefits. The program developed for the client usually includes general recommendations for a course of activity, or specific actions, to be taken by the client. For example, recommendations may be made that the client obtain insurance or revise existing coverage, establish an individual retirement account, increase or decrease funds held in savings accounts, or invest funds in securities. A financial planner may develop tax or estate plans for clients or refer clients to an accountant or attorney for these services. . . .

> Whether a person providing financially related services of the type discussed in this release is an investment adviser within the meaning of the Advisers Act depends upon all the relevant facts and circumstances. As a general matter, if the activities of any person providing integrated advisory services satisfy the elements of the definition, the person would be an investment adviser within the meaning of the Advisers Act, unless entitled to rely on one of the exclusions from the definition of investment adviser in clauses (A) to (F) of Section 202(a)(II). A determination as to whether a person providing financial planning, pension consulting, or other integrated advisory services is an investment adviser will depend upon whether such person: (1) provides advice, or issues reports or analyses, regarding securities; (2) is in the business of providing such services; and (3) provides such services for compensation. . . .

SEC Staff Report on Financial Planners, Subcomm. on Telecommunications and Fin., House Comm. on Energy & Commerce, 101st Cong., 1st Sess. G (1987), reprinted in part, 1987–1988 Fed. Sec. L. Rep. (CCH) § 84 at 220.

■ Financial planners also owe a fiduciary duty to their customers. *See, e.g.,* C. Goforth, *Stockbrokers' Duties to Their Customers,* 33 St. Louis U.L.J. 407 (1989).

Defendants asserted that Jacoway and CIGNA Securities, Inc. were acting as financial planners or broker-dealers, and not as investment advisers, in providing each of the investments at issue.

The term "broker" is defined in § 3(a)(4) of the Securities and Exchange Act of 1934, ch. 404, 48 Stat. 881, 883 (1934)(codified at 15 U.S.C. § 78c(a)(4) (1994)) to be "any person engaged in the business of effecting transactions in securities for the account of others."

The term "dealer" has two basic definitions. The first, in § 2(12) of the Securities Act of 1933, ch. 38, 48 Stat. 74, 75 (codified at 15 U.S.C. § 77b(12) (1994)), provides that a dealer is "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." Thus, this definition can include a broker as well. *See United States v. Crosby,* 294 F.2d 928 (2d Cir.1961), *cert. denied sub nom., Mittelman v. United States,* 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962). The

1934 Act clarifies the distinction by defining, in § 3(a)(5), a dealer as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise . . . ." 15 U.S.C. § 78c(a)(5).

Defendants' characterization of themselves as "broker-dealers" rests on their assumption that a broker-dealer does not owe a fiduciary duty to a customer. However, that is not necessarily the case.

For example, in *Paine, Webber, Jackson & Curtis, Inc. v. Adams, supra,* our supreme court held that the brokerage firm and stockbroker owed fiduciary duties to the customer. In that opinion, the court identified several factors to be considered, including, for instance, the degree of practical control of a customer's account by a broker and the degree of trust and confidence reposed by the customer in the broker. These, as the opinion points out, are issues of fact.

Our review of the record convinces us that genuine issues of material fact remain concerning the existence and characteristics of a fiduciary duty. On the one hand, defendants emphasize that plaintiffs, successful businessmen, received PPMs which disclosed the nature of the limited partnerships and voluntarily chose to invest in them. On the other hand, plaintiffs point to the trust and confidence they placed in Jacoway and his thorough familiarity with their financial situations.

These questions have a critical bearing on the reasonableness of plaintiffs' understanding of the nature of their investments. And, these questions preclude the entry of summary judgment since plaintiffs may have had a lesser duty of care in making inquiries regarding the suitability of their investments. If such a lesser duty existed, reasonable investors in plaintiffs' position may not have discovered facts which otherwise would have placed a reasonable investor on inquiry notice of the circumstances giving rise to the underlying claims. *See Lucas v. Abbott, supra.*

*Dean Witter Reynolds, Inc. v. Hartman,* 911 P.2d 1094 (Colo.1996), does not require a contrary result. In that case, the supreme court determined that the doctrine of equita-

ble tolling did not prevent the statute of limitations from barring the plaintiff's claims against a brokerage firm. The court held that the defendants had done nothing to prevent the plaintiff from filing his claim within the statutory period and that, therefore, equity did not require tolling the applicable limitations periods.

Here, in contrast, the question whether a fiduciary relationship existed between plaintiffs and defendants is a factual predicate to the determination as to when the statutes of limitation began to run on plaintiffs' claims. The doctrine of equitable tolling was not implicated, and the pivotal question is whether genuine questions of material facts remained, rendering inappropriate the entry of summary judgment based upon the expiration of relevant statutes of limitation.

### B.

Plaintiffs next assert that genuine issues of material fact exist concerning the suitability of the investments to their needs and that the entry of summary judgment was not appropriate. Because the question of suitability is not susceptible to determination as a matter of law, under the circumstances presented, this issue too must be considered on remand.

In the context of securities sales, the National Association of Securities Dealers (NASD) has promulgated a rule requiring brokers to make efforts to obtain information relevant to the customer's financial status, tax status, and investment objectives, along with such other information as may reasonably be useful in making recommendations to the customer. The broker is to use this information to select suitable investments for the customer. *See National Ass'n Securities Dealers Manual* (CCH) ¶ 2152.

The suitability of an investment for a particular investor is based upon the ratio between risk and return. Classical investment theory assumes that a rational investor, mindful of his or her investment objectives, will select individual investments with an intent to maximize the amount of return while minimizing the level of risk needed to achieve the return desired from each specific invest-

ment. *See* S. Anderson & D. Winslow, *Defining Suitability*, 81 Ky. L.J. 105 (1992). In contrast, the "modern portfolio theory" of investment emphasizes rapid and substantial return through high-risk investments. Under this theory, losses are minimized by the development of a diverse portfolio. Under this theory, a specific investment might present a significant risk of loss and still be suitable for a cautious investor, so long as the total portfolio reflects sufficient diversity to minimize the overall risk of loss. *See* S. Root, *Suitability—the Sophisticated Investor—and Modern Portfolio Management*, 1991 Colum.Bus.L.Rev. 287 (1991).

Because of the varying theoretical underpinnings of contemporary investment strategies, it is difficult to identify a series of objective, universally applicable standards for determining whether a particular investment is unsuitable for a particular investor. While the risk associated with a particular investment is certainly important, it is not dispositive. Other considerations include the degree of diversity in the investor's portfolio and the investor's underlying strategy and goals.

Here, the parties dispute the factual basis for plaintiffs' allegations of unsuitability. Plaintiffs assert that, in light of plaintiffs' financial status, the investments were unsuitable because they lacked proper diversification, did not conform to the financial plans defendants had prepared for them, and had too great a commitment of plaintiffs' funds.

Defendants respond that the plaintiffs were placed on inquiry notice of any alleged unsuitability when they were given the PPMs and Subscription Agreements, which stated that the investments were high risk, and when they were allegedly told by Jacoway that CIGNA would "stand behind" the investments. This contention assumes, however, that plaintiffs were cognizant, or could be cognizant, of the application of the term "risky" to their individual investment situations. To say, as defendants argue, that a risky investment is one in which the investor could lose all of his or her money begs the question, since every investment has that possibility. And, if a fiduciary duty did exist between plaintiffs and defendants, plaintiffs'

level of inquiry of the significance of the details of their financial status would be altered.

Thus, the alleged unsuitability of the investments is a material question of fact. As long as that issue of fact is in dispute, it cannot be held as a matter of law that plaintiffs were on inquiry notice at the time they made the investments.

Under the circumstances presented here, we conclude that genuine issues of material fact remained and that the granting of partial summary judgment on plaintiffs' common law claims, based on the statutes of limitation, was premature. Specifically, it is a disputed question of material fact whether defendants owed plaintiffs a fiduciary duty and, if so, whether that fiduciary relationship created a climate of false security in which plaintiffs' trust in defendants inhibited their ability to notice defendants' alleged negligence and breach of fiduciary duty to them. *See* Lucas v. Abbott, supra; *Ralston Oil & Gas Co. v. July Corp., supra.* Similarly, it is a disputed question of material fact as to the circumstances that rendered the investments unsuitable for plaintiff's needs. Without a resolution of this issue, it is impossible to determine as a matter of law at what point reasonable investors in the position of plaintiffs would have been on inquiry notice of the alleged unsuitability of the investments.

The judgment is reversed and the cause is remanded for further proceedings consistent with the views expressed in this opinion.

CRISWELL, J., specially concurs.

KAPELKE, J., dissents.

Judge CRISWELL specially concurring.

Because I agree with the analysis contained within and the conclusions reached by Part I A of the principal opinion, I concur in the result.

I agree that there exists a genuine issue of material fact whether a confidential relationship exists and, thus, whether, under the circumstances, plaintiffs must be charged, as a matter of law, with constructive knowledge of the contents of the PPM and Subscription Agreement. *See Ralston Oil & Gas Co. v.*

*July Corp.*, 719 P.2d 334 (Colo.App.1985)(because of confidential relationship, plaintiff not charged with constructive knowledge of written contract signed by him).

I see no need to consider the issue addressed in Part I B of the principal opinion, however, and consequently, I do not concur therein.

Judge KAPELKE dissenting.

I respectfully dissent.

In my view, the trial court properly granted summary judgment in favor of defendants based on its conclusion that the applicable statutes of limitation barred plaintiffs' claims.

A cause of action for breach of fiduciary duty or negligence accrues for statute of limitations purposes on the date the plaintiffs have knowledge of facts which, in the exercise of reasonable diligence, would enable them to discover the occurrence of the act or breach complained of. *Jones v. Cox*, 828 P.2d 218 (Colo.1992); *Hansen v. Lederman*, 759 P.2d 810 (Colo.App.1988).

When the undisputed facts demonstrate that a plaintiff discovered or reasonably should have discovered the defendants' conduct as of a particular date, the issue of when the cause of accrued may be decided as a matter of law. *Reider v. Dawson*, 856 P.2d 31 (Colo.App.1992); *Morris v. Geer*, 720 P.2d 994 (Colo.App.1986).

Here, defendants contend, and the trial court agreed, that plaintiffs' claims accrued when plaintiffs received the respective Private Placement Memoranda (PPMs), which contained information highlighting the risks entailed in the investments. The trial court found that such information placed plaintiffs on actual or at least inquiry notice of the unsuitability of the investment vehicles and of the inaccuracy of any of Jacoway's statements that were inconsistent with the "storm warnings" in the PPMs. I would agree.

A number of federal courts have held that delivery of a PPM or prospectus disclosing investment risks can be sufficient to put the investor on constructive notice of the unsuitability of the investments, thus triggering the commencement of the limitations period.

For example, in *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994), plaintiff was a widow with a tenth-grade education who claimed that the defendants had induced her to invest in limited partnerships that were unsuitable for her because of their risk and illiquidity. Defendants moved for summary judgment based on the running of the pertinent statutory limitation period, contending that the period began to run when plaintiff received the prospectus warning of the high degree of risk inherent in the partnership venture.

In upholding the trial court's entry of summary judgment for the defendants, the United States Court of Appeals for the Sixth Circuit rejected the plaintiff's contention that the issue of when an investor would be on constructive notice is for the trier of fact and may not be resolved as a matter of law. The court held that the warnings in the prospectus "were sufficient to put a reasonable investor of ordinary intelligence on notice of the commissions, the risk, and the illiquidity of the investments." *Dodds v. Cigna Securities, Inc., supra*, at 351.

In *Dodds*, the court also rejected the plaintiff's arguments that summary judgment should have been denied because she had not read the prospectus and because she had allegedly received oral assurances from the defendants contradicting the warnings in the prospectus materials.

Other federal courts have applied an analysis similar to that in *Dodds* in concluding that an investor's receipt of PPMs and similar prospectus-type materials can trigger the accrual of pertinent limitation periods if such materials provide sufficient "storm warnings" of the investment risks. *See Kennedy v. Josephthal & Co.*, 814 F.2d 798 (1st Cir. 1987); *Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir.1992), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992); *Nerman v. Alexander Grant & Co.*, 926 F.2d 717 (8th Cir.1991); and *Hirschler v. GMD Investments Ltd. Partnership*, [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,919, 1991 WL 115773 (E.D.Va.1991), *aff'd*, 972 F.2d 340 (4th Cir.1992).

The plaintiff in *Dodds, supra*, like the plaintiffs here, claimed that the limited partnerships in which she invested were unsuitable to her individual needs and investment strategies. She reasoned that the individual prospectuses did not put her on notice as to the unsuitability of the investments and their effect on her overall portfolio.

In rejecting this contention, the court in *Dodds* pointed to the language in the prospectuses flagging the "high risk" and illiquidity of the limited partnerships. As the court emphasized:

> Plaintiff was constructively aware of the portion of her total portfolio that included investments described as risky and illiquid. That sufficed to raise a duty to inquire into whether they constituted too substantial a portion of her portfolio. Constructive knowledge that roughly a quarter of her assets were being invested in risky, illiquid ventures surely constituted at least a 'storm warning ...' to a reasonable investor with conservative instincts sufficient to raise a duty to inquire further.

*Dodds v. Cigna Securities, Inc., supra*, 12 F.3d at 352.

The plaintiffs here had previously invested in real estate and in other partnerships. According to their financial plans, only 1% of their assets were to be allocated to risky investments, and they had an overall conservative investment strategy.

The PPMs here should have alerted plaintiffs, as reasonable investors of ordinary intelligence, that the partnership ventures were risky, illiquid, and inconsistent with plaintiffs' conservative investment objectives.

The first pages of all the PPMs received by plaintiffs contain an express warning of the high risk nature of the investments. Additional sections explain the risks in detail. In the section labeled *Who Should Invest*, the Nashville PPM states: "Investment in the Units involves a high degree of risk. . . ."

The corresponding sections in the Springs and Hotel PPMs state: "The partnership has adopted a general investor suitability standard which is the requirement that each subscriber for Units represent in writing that: . . . (b) he can bear the economic risk of losing his entire investment. . . ."

Similarly, the PPM for the Regional Mall contained an acknowledgment that the investor "is able to afford the economic risks of the investment (*i.e.*, can afford a complete loss of his, her or its investment). . . ." The *Risk Factors* sections in all the PPMs specifically and extensively describe a variety of risks including conflicts of interest, and emphasize the speculative nature of the investments.

The Subscription Agreements signed by plaintiffs for the Nashville, Spring, and Hotel investments include the following warnings:

> (b) the undersigned ... either (A) is an Accredited Investor, ... or (B) has a net worth sufficient to bear the risk of losing his entire investment .... and can bear the economic risk of losing his entire investment herein ... has, alone or together with his Purchaser Representative ... such knowledge and experience in financial matters that the undersigned is capable of evaluating the relative risks and merits of this investment.

> . . . .

> (e) That (i) it has been called to the undersigned's attention in connection with his investment in the Partnership that such investment is speculative in nature and involves a high degree of risk. . . .

> . . . .

> (o) the undersigned acknowledges and is aware of the following:
>> (i) ... the Units are speculative investments which involve a high degree of risk of loss by him of his entire investment in the Partnership.

I would agree with the trial court that these risk warnings in the PPMs were sufficient to put plaintiffs on notice that the four partnership investments were extremely risky and to contradict any oral statements by defendants that might have been inconsistent with the warnings. Such warnings on their face revealed to plaintiffs that the investments were unsuitable to their relatively conservative investment strategy.

Accordingly, in my view, upon receipt of the PPMs, plaintiffs were on constructive notice of any negligence or breach of fiduciary duty on the part of defendants. Because plaintiffs received the PPMs on the 1983 investments in 1983, their causes of action accrued no later than when, in that same year, they actually invested the funds following their receipt of the risk disclosures. As to those investments, the five-year statute of limitations governing plaintiffs' breach of fiduciary duty claim ran in 1988, and the six-year limitations period on their negligence claim expired in 1989.

Similarly, the two-year limitations period on plaintiffs' negligence claim relating to the 1987 investments accrued in 1987 and expired in 1989.

Since plaintiffs did not even file their original action in federal court until January of 1990, I would agree with the trial court that their claims that are the subject of this appeal are barred by the prior running of the pertinent statutes of limitation.

In concluding that the trial court should not have granted summary judgment for defendants, the majority determines that there is a genuine issue of material fact as to whether defendants and plaintiffs were in a fiduciary relationship. In my view, however, defendants were entitled to summary judgment even assuming that they were fiduciaries.

I recognize that when a fiduciary relationship exists, "facts which would ordinarily require investigation may not excite suspicion, and the same degree of diligence is not required." *Lucas v. Abbott*, 198 Colo. 477, 481, 601 P.2d 1376, 1379 (1979). Nevertheless, even if defendants here are considered to be fiduciaries and plaintiffs' duty of inquiry was, therefore, a lighter one, the storm warnings in the PPMs would so alert a reasonable investor of the high risks of the investments as to trigger an immediate duty of inquiry. That duty arose when plaintiffs received the respective PPMs.

Had plaintiffs alleged an actual fraudulent concealment by defendants following delivery of the PPMs, there might be an issue as to possible equitable tolling of the limitations periods. Plaintiffs have not made such allegations. *See Garrett v. Arrowhead Improvement Ass'n*, 826 P.2d 850 (Colo.1992); *Dodds v. Cigna Securities, Inc., supra.*

Finally, the majority opinion finds that the suitability of the investments remains a genuine issue of material fact. That issue, it seems to me, goes to the ultimate merits of plaintiffs' claims rather than to the critical statute of limitations question posed by the summary judgment motion: when did plaintiffs have knowledge of facts which, in the exercise of reasonable diligence, would have enabled them to discover the alleged negligence and breach of fiduciary duty by defendants.

For these reasons, I would affirm the summary judgment.